People *ex rel.* Bradley agt. Stevens.

# COURT OF APPEALS.

THE PEOPLE OF THE STATE OF NEW YORK *ex rel.* JOHN J. BRADLEY, respondents, agt. THOMAS STEVENS, appellant.

*Croton aqueduct department — appointment of president of the board — constitutional law.*

The court of appeals held, in this case, that the amended charter of the city of New York, in 1849 (*Laws of* 1849, *p.* 282), created a new executive department, called "The Croton Aqueduct Board," with three officers, viz., president, engineer and assistant commissioner, to form such board. Afterwards, and in the same year, another act was passed, entitled "An act to create the Croton Aqueduct Department in the city of New York" (*Laws of* 1849, *p.* 537).

These acts together completely remodeled the Croton aqueduct department. The office of water commissioner was abolished. The board created in its stead was reduced to three members, and with the same and additional duties imposed upon it.

*Held,* therefore, that the Croton aqueduct board, and the officers composing it, were, in substance and effect, new officers created by the act of 1849.

The creation of such offices was within the legislative power; and, being so created since the adoption of the constitution of 1846, the legislature was not restrained in directing how they should be filled; and might even make the appointment itself, as it assumed to do in this case by the act of April 8, 1867, enacting that "the term of office of the persons now severally discharging the duties and exercising the powers of president, commissioner, assistant commissioner and chief engineer, commissioner of the Croton aqueduct department, is hereby fixed for the term of five years, from the first day of January, 1867," &c.

The officers within the second section of the tenth article of the constitution of 1846 must be created directly by the constitution or by the statute. There has been no statute found nor referred to creating this Croton aqueduct board until the act of April 11th, 1849, and it follows that these offices were created since the constitution of 1846 went into effect, and that they do not, consequently, fall under this restrictive clause.

Also, *held,* that that portion of the act of the legislature of May 4, 1866, entitled "An act to enable the board of supervisors of the county of New York to raise money by tax for the use of the corporation of the city of New York, and in relation to the expenditure thereof," which contained the following provision: "The engineer and assistant commissioner of the Croton aqueduct department, now in office, shall continue in office for the term of three years from and after the passage of this act; and any vacancy in their number shall be filled by the members of the board remaining in office," comes in conflict with section 16, article 3 of the constitution of the state, and is void.

This court reversed the judgment of the supreme court, which was in favor of the relator (GROVER, *J., dissenting*); and, subsequently, on stay of remittitur, and special application by the relator, granted a new trial.

On the second trial, before BRADY, J., *held,* that, on looking at the question as *res nova,* the act of 1867 is in contravention of section 2 of article 10 of the constitution. The president of the Croton aqueduct department was an officer within the authority given by the act of 1842; and, having been designated by ordinance under that act, the position was an office created by act of the legislature.

It was not destroyed by the act of 1849, or so changed by its provisions that its identity was lost. It continued, and was recognized by that act and extended by it.

*September Term,* 1869.

THIS was an action, in the nature of a *quo warranto,* brought to try the title of the office of president of the Croton aqueduct board. The relator was nominated December 7th, 1866, by the mayor of the city of New York to the board of aldermen, to the office in question, and was confirmed by the board; whereupon he took the oath of office, and qualified as such president.

At the time of relator's appointment the appellant was in possession of the office to which he had been appointed April 12, 1860, for the term of five years. In 1863 the legislature had enacted, in an act relative to the charter, that the present chief officers of the Croton aqueduct board should continue to hold their offices for four years from the date of the appointment of the present assistant commissioner of the said board. Mr. Robert L. Darragh was the assistant commissioner in office when the act was passed, and had been

People *ex rel.* Bradley agt. Stevens.

appointed such officer December 3, 1862, and the four years from his appointment expired December 3, 1866.

The tax levy act of 1866 contained a clause continuing in office, for a term of three years after its enactment, the officers of the Croton aqueduct board.

In 1867 the legislature, in an act entitled "An act in relation to the Croton aqueduct department," provided that the term of office of the persons now severally discharging the duties of president, &c., was thereafter fixed for the term of five years.

The general term decided in favor of the relator, and the respondent appealed to this court.

*John Slosson & L. R. Marsh,* for appellant.

The defendant, president-commissioner of the Croton aqueduct board, appeals from a judgment of ouster herein.

The relator claims to be entitled to the office of president of the Croton aqueduct board, by virtue of an appointment made by the mayor and aldermen of the city of New York, which appointment was made on the 17th day of December, 1866.

The defendant claims:

1. That the power of appointment had been taken from the mayor and aldermen by an act of the legislature entitled "An act to enable the board of supervisors of the county of New York to raise money by tax," passed May 4, 1866 (*Sess. Laws* 1866, *vol.* 2, *p.* 2059).

And that, therefore, the appointment of the relator was null and void.

2. That by the act of the legislature entitled "An act in relation to the Croton aqueduct department, in the city of New York," passed April 8th, 1867 (*Sess. Laws* 1867, *vol.* 1, *p.* 538), this defendant was vested with the office of president-commissioner of the Croton aqueduct board for the term of five years from the first day of January, 1867.

The main questions in the case turn upon the constitutionality of these two laws, and upon the effect of the relator's disclaimer of the office.

If either of these laws is constitutional, the relator has no claim to the office, and the judgment must be reversed.

The supreme court, at circuit and at general term, held both of these laws to be repugnant to the constitution, and judgment was entered that the relator was entitled to the office claimed, and ousting the defendant.

From this judgment this appeal is taken.

There is no dispute about the facts. All were admitted, and were fully found by the judge who tried the case.

It is unnecessary to refer to the facts, more particularly, here.

Such of them as it is necessary to refer to will be found fully stated in those parts of the following points where the consideration of them appropriately belongs.

I. The act of 1866, entitled "An act to enable the board of supervisors of the county of New York to raise money by tax," &c., which we will hereafter call the "tax levy act," took away from the mayor and aldermen the power of making appointments in the Croton aqueduct board.

The provision in reference to the Croton aqueduct board is as follows:

"The engineer and assistant commissioner of the Croton aqueduct department shall continue in office for the term of three years from and after the passage of this act, and any vacancy in their number shall be filled by the members of the board remaining in office," &c. (*Laws of* 1866).

At the time of the passage of this act the defendant was president of the Croton board.

He had been appointed under the charter of 1857, April 12, 1860, for the term of five years.

The defendant's term of office was extended by the act entitled "An act relative to the charter of the city of New York," passed April 3d, 1863, providing as follows:

" The present chief officers of the Croton aqueduct board shall continue to hold their offices for four years from the date of the appointment of the present assistant commissioner of said board, and until their successors shall have been duly appointed and qualified (*Laws of* 1863, *chap.* 68, *p.* 92).

No question is made as to the validity of this law. It merely extends the time of holding the office, and is therefore directly upheld by the case of *The People ex rel. Loew* agt. *Batchelor* (22 *N. Y.*, 128).

It is conceded and found that the defendant held the office in question under this extension until December 3d, 1866.

And it is also conceded and found that the defendant still continues in possession of, and exercises and discharges the duties of said office.

Unless, therefore, the relator has been duly and legally appointed to the office in question, the defendant, without any further appointment, holds over and continues in said office until a successor shall have been duly appointed and qualified (*Act of* 1863, *supra ;* 1 *R. S.*, 117 [*marg.*], *sec.* 9).

The plaintiff, as stated, claims to have been appointed to the office by the mayor and aldermen of the city of New York, pursuant to the provisions of the charter of 1857 (*Laws of* 1857, *secs.* 24, 19).

The first question, then, is whether the power of appointment at that time was vested in the mayor and aldermen.

The provision of the " tax levy act " already quoted, if constitutional, clearly divests the mayor and aldermen of this power of appointment and bestows it upon the members of the Croton aqueduct board.

" Any vacancy in their number shall be filled by the members of the board remaining in office."

This provision clearly means vacancies in the board and has been so held, between these parties, and acquiesced in and not appealed from (*People ex rel. Bradley* agt. *Stevens*, 2 *Abb.* [*N. S.*], 148). As to the validity of this provision : But the relator claims, and the court has found, that this provi-

sion is "null and void as being repugnant to the constitution of this state."

The claim is, that it is repugnant to section 16 of article 3 of the constitution.

"No private or local bills, &c., shall embrace more than one subject and that shall be expressed in the title."

It is submitted, on the part of the defendant, that this provision in the "tax levy act" is, in all respects, constitutional and valid, and, further, that an act of the legislature will not be declared void by this court unless it clearly and plainly violates the restrictions of the constitution.

"It is the exercise of a judicial function of the most delicate nature to declare an act of the legislature void, and it is not to be expected that courts will assume it unless the case be plainly and clearly in derogation of constitutional limitations. Nor is it to be expected that they will be zealous or astute to find grounds to thwart or defeat the legislative will, or resort to subtle or strained constructions to bring a statute into conflict with the organic law; but it is to be expected that they will presume in favor of the constitutionality of a statute giving a liberal construction to uphold it and refrain from declaring legislative action void, unless such a conclusion cannot be avoided" (*Met. Board of Excise* agt. *Barrie*, 34 *N. Y.*, 657, 668). *Onus* on the party assailing (15 *N. Y.*, 543 ; 37 *id.*, 378 ; *Pt.* 1, *and cases*).

1. The "tax levy act," as a whole, is a general act and does not come within the purview of article 3, section 16 of the constitution.

There are no authorities holding directly the tax levies, which are passed yearly, to be local acts, but there are authorities which hold the other way. In *People ex rel. Bradley* agt. *Stevens* (2 *Abb.* [*N. S.*], 348, 351, 352) the supreme court held such an act not to be a local act, judge INGRAHAM saying : "I have not been able to find any direct adjudication that a law providing for raising moneys for taxes in a city or county is a local law."

In *Bretz* agt. *The Mayor*, *&c.* (35 *How.*, 135), the superior court of the city of New York held a tax levy to be a public act and valid, although it deprived that court of jurisdiction of a certain class of actions.

In *People* agt. *Acton* (48 *Barb.*, 524) the supreme court still expresses the opinion that the tax levy is not a local act.

In the case of *Williams* agt. *The People* (24 *N. Y.*, 405), it was held that an act prescribing a higher degree of punishment for larceny from the person when committed in the city of New York, was not a local act, because it affected all persons, wherever resident, who might come into the city of New York. The tax levy, within the principle of this case, is not a local act. It certainly affects all persons, wherever resident, who own property within the city of New York (*And see Connor* agt *The Mayor*, 2 *Sand.*, 355 ; *S. C.*, 1 *Seld.*, 285, 297).

2. The question whether this act is a local act is *res adjudicata* between these parties, having been decided in the case already cited of *The People ex rel. Bradley* agt. *Stevens* (2 *Abb.* [*N. S.*], 348).

In 1866, the people, on the relation of the present relator, Bradley, applied for a mandamus against this defendant Stevens. The decision of the court holding this very act not local but valid was not appealed from, but, on the contrary was acquiesced in ; and, as between these parties, whether rightly decided or not, stands as the adjudicated law.

It will be contended, and judge INGRAHAM has since intimated, that that decision was put on the ground that a mandamus was not the proper remedy. But this is not so, for the court in that case merely referred to the form of remedy as a cumulative objection, saying, after having stated the chief ground of the decision : " Independent of these views, it is a matter of great doubt whether a mandamus is a proper remedy in this case " (*P.* 352).

3. The above cited provision in the tax levy act of 1866

is not a local provision, the Croton aqueduct board not being a local body, and is therefore valid. Even if the tax levy, *per se*, were a local act, any provisions, not of a local character, contained in it would be valid. " The character of an act is to be determined by its provisions, and not by its title, and general provisions are not rendered void by reason of their being contained in the same act with other provisions of merely local application, though the title of the act refers to the latter provisions only " (*People* agt. *McCann*, 16 *N. Y.*, 58; *Williams* agt. *The People*, 24 *N. Y.*, 405, 407).

And if the Croton aqueduct board is not a local body, an act in relation to it is not a local act.

Thus, legislation as to the metropolitan police board is not local, that not being a local body (*People* agt. *Acton*, 48 *Barb.*, 524, 529; *affirmed by this court, not reported, no opinions*).

Within the authorities interpreting this provision, and also section 2 of article 10 of the constitution, the Croton board is not a local body.

*a.* As to the authorities, from the different cases the following proposition may be stated : The term local in this provision of the constitution refers and is limited to particular cities or counties, and an office whose duties extend into more than one county is not a local office (*People* agt. *Draper*, 15 *N. Y.*, 532; *People* agt. *Sheperd*, 36 *N. Y.*, 285; *Met. Board of Health* agt. *Heister*, 37 *N. Y.*, 661).

" Hence it follows that if the provisions of the statute had been limited territorially to the city of New York, it would have been in conflict with the section of the constitution so often referred to " (*People* agt. *Draper*, 15 *N.Y.*, 540). And when an office, therefore, confined to the city of New York, and therefore local, has been extended to several counties, it ceases to be a local office (*See last above cited case*).

" Should the legislature determine that the functions of public administrator, for instance, should be no longer local, but that convenience would be promoted by establishing an

office having the same powers, with a jurisdiction co-extensive with the state, there is nothing in the constitution to prohibit such an act of legislation. But suppose it should be considered that public convenience would be promoted by the establishment of such an office, with jurisdiction over the maritime counties of the state only,  *  *  *  the constitutional provision would no longer meet the case, and it would be left to the legislature to provide such mode of appointment as it should judge expedient (*People* agt. *Draper*, 15 *N. Y.*, 547).

" That this is a local bill cannot, I think, admit of any question. Burrill, in his *Law Dictionary*, defines the word ' local' as follows ; ' Relating to place ; belonging or confined to a particular place, distinguished from general, personal or transitory.'

" This act is purely local in its application. It has no force beyond a particular city or county, and is therefore confined to a particular locality (*People* agt. *Hills*, 35 *N. Y.*, 449, 451).

" The first inquiry obviously is, whether section 8 of the act above referred to, so far as it relates to the terms of office of councilmen in the city of New York, and the time, &c., of their election, is local, in the sense of the constitution. It is clear that it relates only to the officers of the municipal corporation of New York, and has no force outside of the territory embraced in the corporation, nor any possible effect upon property not within the corporate limits, or upon persons not for the time being within such limits. It would seem to follow, necessarily, that the act in question is local, as contradistinguished from general " (*Opinion of judge* GROVER ; *People* agt. *O'Brien*, 6 *Trans. Ap.*, 90).

The office of health officer at the port of New York, is neither a city nor a county office (*In the matter of Whiting*, 2 *Barb.*, 513). " The health officer is not required by law to reside in this city and county, but the due performance of his duties, in fact, requires his residence out of the county ; and

his functions are to be exercised out of as well as in the city and county (*Id.*, 516).

*b.* As to the Croton aqueduct department, it is proved in the case and found by the judge, that the duties of this department are not confined to the city of New York, but extend into the counties of Westchester and Putnam. In addition to supplying the city with water, the department is charged " with the preservation of the Croton lake and waters ; with the preservation of the banks of the Croton river from injury or nuisances ; with the execution of such measures as may be necessary to preserve and increase the quantity of water and keep it pure," &c., and generally with the management and preservation of the entire aqueduct and all property pertaining thereto. " They shall be responsible for the supply of water, and the good order and security of all the works from the Croton lake to the city, inclusive. * * * And shall inspect thoroughly the interior of the aqueduct, and make the necessary repairs at least twice in each year " (*Laws* 1849, *p.* 538, *sec.* 4 ; *see, also, Desoy* agt. *The Mayor*, *&c., of N. Y.*, 36 *N. Y.*, 449, 450, *judge* PORTER's *opinion*). The Croton board also furnishes the Sing Sing prison with water, and is paid therefor by the treasurer of the State (*Laws* 1861, *p.* 644, *ch.* 282). And the board is authorized to acquire land to extend their works and to construct, and is constructing, impounding or storage reservoirs in the counties of Westchester and Putnam (*Laws* 1865, *p.* 446, *ch.* 285). In view of these multifarious duties and powers, extending into three counties, it seems clear that the Croton board is not a local body, and that a law in relation to it is not a local law, within the above provision of the constitution.

In the case already cited between these very parties (2 *Abb.* [*N. S.*], 348, 352), judge INGRAHAM said : " Under the decisions of the court of appeals in regard to the police law, the fire department, and the health law, it must be conceded that acts which in any manner affect any part of the state outside of the limits of the city of New York, will not be considered

local acts, but for all purposes and powers of legislation, are to be treated as acts of a general character, not within the constitutional restrictions above referred to."

In *The People* agt. *Pinckney* (32 *N. Y.*, 377, 383), judge NOAH DAVIS said, in reference to the act to create the metropolitan fire district : "It is in vain to search the act for any authority given to the department beyond the limits of that city; and the city of Brooklyn is as much outside of their control and authority as any other city of the state. To the body or board thus created, no power whatever, which relates either in its extent or exercise to the fire district created by the first section of the act, is given, but every power is limited to a single locality of the district."

But here, not only is the authority to act given, but the duty is imposed of acting in the three counties of New York, Westchester and Putnam. "They shall be responsible for the supply of water, and the good order and security of all the works, from the Croton lake to the city, inclusive" (*See above*).

Suppose these powers and duties, instead of extending to the three counties named, were declared to extend to the " maritime counties," as suggested in the above extract from the opinion of judge DENIO, in *The People* agt. *Draper* (15 *N. Y.*, 547), can there be any doubt that such an act would not be a local act?

Suppose the Croton lake were fed by streams flowing from springs in every county of the state, and the act gave authority, and imposed the duty upon the board of guarding and preserving those springs and their outflowing streams till they reached the lake, and their banks, and of preserving the Croton lake and waters, and the banks of the Croton river, and the works from the Croton lake to the city, thus giving authority and imposing the duty to act in every county of the state, can there be any doubt that such an act would not be a local act? And yet, in fact and principle, it would be no more general than the act we are seeking to maintain.

So this act is clearly within the necessary implications of judge GROVER's opinion, in *The People* agt. *O'Brien*, above cited, for the authority to this officer, and the duty imposed on him, have "force outside the territory embraced in the corporation," and have "effect upon property not within the corporate limits," and also "upon persons not for the time being within such limits," and therefore within the whole scope of the reasoning of that opinion, as well as its express language, the act is not a local act in the sense of the constitution.

II. The defendant is entitled to the office by virtue of the act entitled "An act in relation to the Croton aqueduct department in the city of New York," passed April 8, 1867.

"Section 1. The term of office of the persons now severally discharging the duties and exercising the powers of president-commissioner, and chief-engineer-commissioner of of the Croton aqueduct department, is hereby fixed for the term of five years, from the first day of January, 1867," &c. (*Laws* 1867, *vol.* 1, *p.* 538).

It was proved in the case, and found by the court that, at the time of the passage of this act, the "defendant was discharging the duties and exercising the powers of said office of president of the said Croton aqueduct board." Therefore, the defendant is entitled to the office by virtue of this act, unless the same is repugnant to the constitution.

·It is claimed by the plaintiff that this act is repugnant to the provisions of section 2, of article 10 of the constitution, relative to city and county offices. The defendant claims that the act is not so repugnant:

1. Because the Croton aqueduct board, and the officers thereof, were created since the adoption of the constitution of 1846. It is clear that all offices created since the adoption of that constitution, even city and county offices, may be filled in such manner as the legislature may direct (*People* agt. *Draper*, 15 *N. Y.*, 532; *People* agt. *Batchelor*, 22 *N. Y.*, 128; *People* agt. *Woodruff*, 32 *N. Y.*, 355; *People* agt.

People *ex rel.* Bradley agt. Stevens.

*Pinckney*, 32 *N. Y.*, 377; *Met. Board of Health* agt. *Heister*, 37 *N. Y.*, 661). November 3, 1846, constitution went into effect. April 2, 1849, amended charter of city passed.

Section 15 of such amended charter makes a new executive department, called "the Croton aqueduct board," with three officers, "president, engineer, and assistant commissioner, who together shall form the Croton aqueduct board" (*Laws* 1849, *p.* 282, *sec.* 15). On April 11, 1849, was passed "An act to create the Croton aqueduct department in the city of New York" (*Laws* 1849, *p.* 537). From this title it is evident that the legislature intended to create, and thought they were creating a new office.

Section 1 abolishes the water commissioners, created by the first act of 1834. Section 4 imposes on the Croton board a variety of duties which were not imposed on the water commissioners, and also in addition to those imposed by the charter of 1849. Section 5 makes the president-commissioner the president of the board, and charges him with the general superintendence " and direction of all the business and concerns of the department, and the execution of the laws and ordinances relating thereto."

This Croton board, and the officers thereof, have been held by the supreme court to be created since 1846. " It was not denied at the argument that these officers were created by law in 1849, since the adoption of the constitution in 1846, and from an inspection of the laws the fact appears to be so " (LEONARD, *J.*, *in People* agt. *Giles, not reported, decided June,* 1865). By subsequent legislation, and prior to the act of 1867, claimed to be unconstitutional, the duties and powers of the Croton board have been greatly extended. In 1853 the board was authorized to purchase land for a new reservoir (*Laws* 1853, *p.* 961, *sec.* 1).

By the charter of 1857 the board was charged with the construction and repairs of all street pavements, of wells and pumps, and the supervision of vaults constructed under the

public highways (*Laws* 1857, *p.* 881, *sec.* 24). In 1860 the board was authorized to acquire title to other lands, to construct a junction gate-house and aqueduct, lay mains in Central park, &c., &c. (*Laws* 1860, *p.* 772). Authorized to complete improvements at aqueduct bridge, over Harlem river, without contract (*Laws* 1861, *p.* 436). By act of 1861 the board is to supply Sing Sing prison with water, and the treasurer of the state is to pay therefor; and it is done (*Laws* 1861, *p.* 644). In 1863, authorized to acquire other lands (*Laws* 1863, *p.* 152). In 1865, authorized to acquire lands in Putnam and Westchester counties for storage reservoirs (*Laws* 1865, *p.* 446). By the act of 1865 the whole control of the sewerage of the city is vested in the Croton board (*Laws* 1865, *p.* 715).

This subsequent legislation is important, on the question whether or not the office has not been thereby so changed as to become an entirely different office from any existing before such legislation.

In view of these laws it is submitted that the Croton aqueduct board, and the president-commissioner thereof, are offices created in 1849, and much enlarged by subsequent laws, and are within the meaning of the authorities above cited; in no sense essentially the same with any office existing before the constitution. They are different in name, different in purpose, and different in function.

2. The office in question is not a city or county office, the Croton board not being a local body, and, therefore, the legislature had power of appointment (*See argument as to this proposition under point* 1).

III. The relator has waived and abandoned all claim to the office, and, therefore, is not now entitled to claim it.

He claims to have been appointed December 17, 1866. This action was not commenced till May 28, 1868, about a year and a half after relator's alleged appointment.

On the 23d of January, 1867, the relator gave written notice and protest to the comptroller against paying any

People *ex rel.* Bradley agt. Stevens.

salary of the office to the defendant, and claiming that the relator was entitled to the office and salary.

On the 24th of April, 1867, the relator appeared before the comptroller with the defendant, and publicly withdrew said protest, and consented to the payment of salary to the defendant, and from that time to the commencement of this action said relator has made no objection or opposition to the defendant's receiving the salary or retaining the office.

In other words, he abandoned all claim to the office or salary over a year before he commenced this action. The reasoning of this court in *People* agt. *Board of Met. Police* (26 *N. Y.*, 316, 320, 321), applies with equal force to the case of the relator here.

"The legislature thrusts office on to him, according to his theory, which he refuses; he has never held or exercised it, or discharged any duties pertaining to it; has disclaimed taking it, and repelled its duties, and has followed his own pursuits, having no connection with the police service, and thus, after refusing, disclaiming and abandoning the office and its duties, he claims to have been all the while an officer. *de jure*, by operation of law, against his will, and asks a mandamus, after two years of self-chosen *de facto* separation from the office, to be reinstated in it. It needs no argument to show that the writ of mandamus ought never to be granted to one in the position of the relator. If he could refuse or reject, withdraw from or abdicate the office, and thus vacate it, he has no claim to be reinstated. That he could do either of these things does not admit of a doubt."

The relator in this case has as fully abandoned or resigned his office, and all claim thereto, as had the relator in the case cited.

IV. The judgment should be reversed, and defendant adjudged entitled to the office.

*M. B. Champlain,* attorney-general, *A. R. Lawrence & John K. Porter,* for respondent.

First. This is an action, in the nature of a *quo warranto*, brought to try the title to the office of president of the Croton aqueduct board.

Second. The relator, John J. Bradley, was nominated on the 7th day of December, 1866, by the mayor of the city of New York to the board of aldermen for the office in question in the place and stead of the appellant.

Third. On the 18th of December, 1866, Bradley was confirmed by the board of aldermen by a unanimous vote, and on the same day he took the oath of office before the mayor of the city and qualified as such president.

Fourth. At the time of Bradley's appointment the appellant was in possession of the office in question.

He had been appointed to such office by the mayor and aldermen on the 12th day of April, 1860, for a term of five years.

At the time of the appellant's appointment the following sections of the charter of 1857 were in force, and continue in force, except so far as altered by the acts hereinafter set forth:

Section 24. There shall continue to be an executive department, under the denomination of the "Croton aqueduct board," which shall have charge of the Croton aqueduct and all structures and property connected with the supply and distribution of Croton water in the city of New York, and the underground drainage of the same, and the public sewers of said city, and permits for street vaults, and of paving, repaving and repairing streets and digging and constructing wells, and the collection of the revenues arising from the sale of the Croton water, with such other powers and duties as are, or may be, prescribed by law. The chief officers thereof shall be called the "president, engineer and assistant commissioner" who, together, shall form the Croton aqueduct board and hold their offices for five years. There shall be a bureau in this department for the collection of the revenues derived from the sale of the water, and the chief officer thereof

People *ex rel.* Bradley agt. Stevens.

shall be called the " water registrar." There shall also be a bureau in this department for the laying of water pipes and the construction and repairs of sewers, wells and hydrants, paving, repaving and repairing streets, the chief officer of which shall be called the " water purveyor."

Section 19. The mayor, comptroller and counsel to the corporation shall each be elected by the electors of the city, the mayor for the term of two years, the counsel to the corporation for the term of three years and the comptroller for the term of four years. The comptroller shall be voted for upon a separate ballot. The other heads of departments shall be appointed by the mayor with the advice and consent of the board of aldermen. The board of aldermen shall have power to confirm or reject all nominations of officers made by the mayor; and whenever any person nominated by the mayor shall be rejected by the board of aldermen, the mayor shall immediately nominate another person.

Section 21. The other heads of the executive departments, except the officers of the Croton aqueduct board, shall hold their office for two years and until the appointment of their successors. * * * (*Laws of* 1857, *pp.* 878, 881.)

On the 3d day of April, 1863, the legislature passed the following act :

" An act relative to the charter of the city of New York," passed April 3d, 1863, three-fifths being present.

" Section 1. The terms of office of the several heads of departments of the corporation of the city of New York, holding office by appointment under the charter of the said city, shall hereafter be four years, and until their successors have been duly appointed and qualified. The several heads of departments of said corporation, now in office by appointment under said charter, shall hold office for four years from the date of their respective appointments, and until their successors have been duly appointed and qualified, except the present chief officers of the Croton aqueduct board, who shall continue to hold their offices for four years from the

date of the appointment of the present assistant commissioner of said board, and until their successors shall have been duly appointed and qualified.

" Such heads of departments shall· hereafter be subject to·· removal from office only for the causes and in the manner now provided by law for the removal of the comptroller of said city.

" Section 2. This act shall take effect immediately " (*Laws of* 1863, *p.* 92).

Robert L. Darragh was the assistant commissioner in office when the above act was passed, and had been appointed as such officer on the 3d day of December, 1862. The four years from the date of Darragh's appointment expired December 3d, 1866.

Fifth. Notwithstanding the appointment of the respondent, the appellant, ever since his appointment on the 12th day of April, 1860, has been exercising the powers of president of said board.

On the 4th of May, 1866, the legislature passed the annual tax levy for the city of New York.

"An act to enable the board of supervisors of the county of New York to raise money by tax for the use of the corporation of the city of New York, and in relation to the expenditure thereof." Said act contained the following provision : " * * * Salaries Croton aqueduct department, $91,780. The engineer and assistant commissioner of the Croton aqueduct department, now in office, shall continue in office for the term of three years from and after the passage of this act, and any vacancy in their number shall be filled by the members of the board remaining in office. The engineer shall receive a salary at the rate of $7,500 a year, and the president and assistant commissioner shall each receive a salary at the rate of $5,000 a year; and no office in that department shall be abolished, nor shall the compensation of any office in that department be increased or diminished without the consent of a majority of the said chief officers " (*Laws* 1866, *vol.* 2, *p.* 2059).

People *ex rel.* Bradley agt. Stevens.

On the 8th day of April, 1867, the legislature passed "An act in relation to the Croton aqueduct department in the city of New York," which contained the following provisions : " Section 1. The term of office of the persons now severally discharging the duties and exercising the powers of president-commissioner, assistant commissioner, chief-engineer-commissioner of the Croton aqueduct department, is hereby fixed for the term of five years from the 1st day of January, 1867, and every vacancy in said offices shall be filled for the residue of said term by the remaining commissioners. All appointments after the expiration of said term shall be filled for the full period of five years.

" Section 2. The said commissioners shall have authority from time to time to appoint and fix the compensation of such clerks and employes as they may deem essential to the effective discharge of the duties of said department; and said commissioners respectively shall receive the same compensation as is now authorized by law. They shall establish a scale of rents for the supplying of the Croton water, which rents shall be collected in the manner now provided by law."

" Section 3. This act shall take effect immediately " (*Laws of* 1867, *p.* 538).

Sixth. On the 11th April, 1842, the legislature passed an act entitled " An act for the preservation of the Croton water-works in the city of New York," by which the mayor, &c., of New York were authorized to pass such by-laws and ordinances as to them should seem meet for the preservation and protection of all or any of the works connected with the supplying of the city of New York with pure and wholesome water, passed May 2, 1834, &c., and also to organize a " department with full power for the management of such works and the distribution of the said water " (*Laws of* 1842, *p.* 276).

In pursuance of this act an ordinance was passed organizing a Croton aqueduct department by the common council (*Vol.* 10 *Proceedings C. C. p.*, 36).

The 'amended charter of the city, passed April 2, 1849, provided that there should be an executive department, under the denomination of the Croton aqueduct board, &c. (*Laws of* 1849, *sec.* 15, *p.* 282).

On the 11th of April, 1849, the legislature passed an act entitled "An act to create the Croton aqueduct department in the city of New York" (*Laws of* 1849, *p.* 537).

Seventh. There was a protest by the relator to the comptroller of the city against the payment of any salary to the appellant, which the relator withdrew subsequently to the passage of act of 1867.

Eighth. It was agreed that either party might refer, on the argument of this appeal, to any statutes which may be regarded by such party as bearing on the case.

I. It cannot be disputed, that under the provisions of the act of April 3, 1863, entitled "An act relative to the charter of the city of New York," the term of office of the appellant, as president of the Croton aqueduct board, expired in four years from the date of the appointment of the assistant commissioner in office at the time the said act was passed, to wit, Robert L. Darragh. Darragh was appointed on the 3d day of December, 1862, and consequently, under the act aforesaid, the term of the appellant expired on the 3d day of December, 1866; he being entitled to hold over under the act until his successor was appointed and qualified (*Act, Laws of* 1863, *pp.* 92, 93).

II. Nor can it be disputed that the relator, Bradley, was duly nominated by the mayor of the city of New York, to the board of aldermen, on the 7th day of December, 1866, for the office of president of the Croton aqueduct board, and that he was duly confirmed by the said board of aldermen, as such president, on the 18th day of December, 1866, unless the provisions of the charter of 1857, relative to the appointment of the heads of departments, had been abrogated, *quoad* the office in question, by the act of 1866, which is set up in the answer of the appellant (*Laws of* 1866, *vol.* 2,

*p.* 2059; *Charter of* 1857 [*Laws of* 1857, *vol.* 1, *p.* 878], *secs.* 19–21).

III. We are, therefore, brought down to the first great question in this case, which is, as to the validity and effect of the act of 1866, upon which the appellant relies.

The act in question is what is commonly designated as the tax levy of the city of New York. It is entitled, "An act to enable the board of supervisors of the county of New York to raise money by tax for the use of the corporation of the city of New York, and in relation to the expenditure thereof."

The provision is as follows: " Salaries — Croton aqueduct department, $91,780. The engineer and assistant commissioner of the Croton aqueduct department now in office shall continue in office for the term of three years from and after the passage of this act, and any vacancy in their number shall·be filled by the members of the board remaining in office. The engineer shall receive a salary at the rate of $7,500 a year, and the president and assistant commissioner shall each receive a salary at the rate .of $5,000 a year, and no office in the department shall be abolished, nor shall the compensation of any office in the department be increased or diminished without the consent of a majority of the said chief officers " (*Laws of* 1866, *vol.* 2, *p.* 2059).

IV. The respondents insist that the provision above set forth is unconstitutional and void, and therefore did not operate so as to take away from the mayor and aldermen of the city the power previously possessed by them of filling the office in question.

1. The act which is under discussion is a local bill or act, and therefore, by the sixteenth section of the third article of the constitution, it could embrace but one subject, and that should have been expressed in its title. Now it is quite clear that the title of the act of 1866 does not, in the remotest manner, refer to any change being made in the mode of appointing the president of the Croton aqueduct board. ˙The only object referred to, the only subject expressed, in the

title, is the raising of money by tax for the use of the corporation of the city of New York, and the expenditure thereof. No one would suppose from reading the title that there was any amendment to the general provisions of the charter of the city contained in the act. And yet, if the provision in question can be upheld, it effects a radical change in the manner of the appointment of the chief officers of one of the most important departments in the municipal government (*Charter* 1857, *secs.* 19–21, *supra*).

2. We are not, however, without authority upon the question that the annual tax levy of the city of New York is a local bill or act, within the provisions of the sixteenth section of the third article of the constitution. This court held, in the case of *The People, &c.,* agt. *O'Brien,* that the tax levy of 1867 was a local act, and that a provision contained in said act extending the terms of the persons then constituting the board of councilmen for one year, and providing that thereafter the term of councilmen should be two years, was another and separate subject within the section of the constitution above referred to, from that which was expressed in the title, and could not be upheld (*People* agt. *O'Brien, MS. opinion of* GROVER, *J.; Laws of* 1867, *vol.* 2, *pp.* 1606, 1607).

So, too, in the case of *The Sun Mutual Insurance Company* agt. *The Mayor, &c., of New York* (4 *Selden, pp.* 240, 252, 253) it was held that the tax levy for the year 1850 was a local act and that the subject must be expressed in the title, but in that case the court decided that the subject of the act was sufficiently expressed in its title (*See, also, People* agt. *Acton,* 48 *Barb., pp.* 529–530, *opinion of* INGRAHAM, *J.; Baldwin* agt. *Mayor, &c.,* 42 *Barb.,* 549; *Same case,* 39 *N. Y., p.* 393, *opinion* PECKHAM, *J.; People* agt. *Hills,* 35 *N. Y.,* 449).

3. The cases of *People* agt. *McCann* (16 *N. Y., pp.* 58–60), and *People* agt. *Williams* (24 *N. Y.,* 405) do not in any way affect the views above expressed.

People *ex rel.* Bradley agt. Stevens.

In the first case the act was decided not to be a local act, because it contained provisions which related to the courts of oyer and terminer in the state generally; and the rule was laid down that the character of an act was to be determined by its provisions, and not by its title.

In the second case the court did not pass upon the question whether the act was local within the provisions of the section of the constitution above referred to.

Judge DENIO held that the act was not local, because it prescribed the rule of conduct for all persons, whether residents of the city or of any other part of the state; and its increased penalties were intended to protect residents of other localities equally with inhabitants of the city, and, because offenders, when convicted, were to be imprisoned in one of the state prisons out of the city, and to be provided for at the expense of the state at large; and the disqualification attaching to the convict under the act affected him wherever he might be in the state (24 *N. Y.*, *pp.* 407–409).

Judge SUTHERLAND thought that the provisions of the act were local (24 *N. Y.*, *p.* 410).

4. Even assuming that the opinion of judge DENIO, in the case of *The People* agt. *Williams*, contains the correct rule for ascertaining whether an act is to be regarded as *local* in its character, that case does not aid the appellant.

*a.* The whole expense of constructing, maintaining, preserving and supporting the Croton water-works and the Croton aqueduct department, and all the structures and apparatus connected therewith, and of paying the officers and workmen thereof is now and always has been borne by the inhabitants of the city of New York (*Charter of* 1857, *sec.* 24; *Laws of* 1857, *vol.* 1, *p.* 881).

The first act which provided for the appointment of commissioners, in relation to supplying the city of New York with pure and wholesome water, passed February 26th, 1833, declared that:

Section 8. " All reasonable expenses to be incurred under

said act should be paid by the mayor, aldermen and common-alty of the city of New York" (*Laws of* 1833, *p.* 36).

The next act of 1834 provided that the question whether the common council should incur the expense which would be necessary to carry the plan of the water commissioners into execution should be submitted to the electors of the city, and that upon their assent being obtained, it should be law-ful for the common council to instruct the water commission-ers to proceed in the work, and to raise by loan, &c., a sum not exceeding $2,500,000, by the creation of a public fund or stock to be called " the water stock of the city of New York," &c. (*Laws of* 1834, *p.* 452, *secs.* 7, 8, 9).

Various acts have from time to time been passed authoriz-ing the mayor, &c., of New York to issue additional stock to raise moneys for the purpose of introducing the Croton water into the city, and for maintaining, enlarging, or constructing the works required therefor, and to raise by tax the interest to become due on said stock. Some of these we cite : *Laws of* 1838, *pp.* 88, 89 ; *Laws of* 1838, *p.* 74, *sec.* 3 ; *Laws of* 1840, *pp.* 126, 127 ; *Laws of* 1841, *pp.* 298, 299 ; *Laws of* 1843, *p.* 329 ; *Laws of* 1845, *p.* 247 ; *Laws of* 1849, *p.* 128 ; *Laws of* 1851, *p.* 454.

There are numerous other acts, but the above are sufficient to show that so far as expense is concerned, the Croton aque-duct department is entirely local in its operation, and that the burthen of its support only affects the inhabitants of one locality.

*b.* In the next place, the department is one of the departments of the municipal government of the city, and all its principal duties and functions relate to one object, *i. e.,* supplying and distributing Croton water in the city of New York, and the collection of revenues which may arise from the sale of the water (*Charter, sec.* 4, *supra*).

It possesses a few other powers, such as the construction of sewers, the paving and repaving of streets, &c.; but they are all either incidental to the supply and distribution of the

water through the city, or are in and of themselves strictly matters of local jurisdiction (*Charter, sec.* 24, *supra.*)

5. It cannot be said that because a portion of the property which is used for the purpose of supplying the city of New York with Croton water is situated in adjoining counties, that therefore an act which relates to the Croton aqueduct department is not a local act.

*a.* The property situated in Westchester county is held and appropriated by the corporation of the city " only for the use and purpose of introducing water into the city of New York, and for purposes necessarily incident thereto, and for no other uses or purposes whatever " (*Laws of* 1836, *p.* 709, *sec.* 1).

And in case at any time the lands should be used by the said corporation for any other purpose, or should not be required for such purpose, they revert under certain conditions to the original owner (*Id., sec.* 2).

And the land acquired in Putnam county is held in trust " that the same be appropriated as and for a reservoir or reservoirs of the Croton aqueduct " (*Laws of* 1865, *p.* 450, *sec.* 8).

It is quite clear that the lands through which the aqueduct passes and on which the reservoirs are located, are held only for a local purpose, under the acts aforesaid.

*b.* Again, by the act of May 7th, 1840, the aqueduct and its works and the capital therein employed and belonging to the city of New York, is to be assessed and taxed only within the city and county, and in the same manner as the personal property of the said corporation is assessed and taxed (*Laws of* 1840, *p.* 185).

These provisions all go to show that the legislature intended that the Croton aqueduct should be regarded as a local institution in every respect.

6. The employment of superintendents and workmen and the expenditure of money for maintaining and keeping up the aqueduct in Westchester and Putnam counties, do not

divest the department of its local character. Such employment and expenditure are incidental to the local purpose of supplying the city with water.

7. The contract with the state for supplying Sing Sing prison with Croton water, does not change the local character of the department. The money realized from that contract all goes to the support of the department, or the payment of the debt of the city incurred in the construction of the aqueduct and its attendant reservoirs and works (*Laws of* 1861, *p.* 644; *Laws of* 1845, *p.* 248).

V. If the positions assumed in the foregoing points are correct it follows that the nomination of the relator, Bradley, by the mayor, and his subsequent confirmation by the board of aldermen on the 18th of December, 1866, legally constituted him, after he took the oath of office and qualified, the president of the Croton aqueduct board for a term of four years from such appointment (*Laws of* 1863, *p.* 93).

VI. The act of April 8th, 1867, which is relied upon by the appellant in his answer, does not avail him in this case (*Laws of* 1867, *p.* 538).

1. Before that act was passed the municipal authorities who were authorized by law to fill the office in question had acted, and appointed the relator for a term of four years from December 18th, 1866 (*Charter* 1857, *secs.* 19–21, *supra; Laws of* 1863, *pp.* 92, 93), and the relator was, *de jure,* the president of the Croton aqueduct board at the time the act of 1867 was passed. If the act of 1867 could have the effect which is claimed for it by the appellant, it would amount to a legislative dispossession of one lawfully in office, and the placing of one having no title to the office in possession of it.

2. The act, on its face, purports to continue *de facto* officers in possession. The persons spoken of are referred to as "the persons now severally discharging the duties and exercising the powers of president-commissioner, assistant commissioner and chief-engineer-commissioner of the Croton aqueduct department," &c. (*Laws of* 1867, *p.* 538).

People *ex rel.* Bradley agt. Stevens.

In the case of *The People* agt. *Batchelor* (22 *N. Y.*, 128) it was held that the legislature might extend the term of local officers beyond the time for which they were elected or appointed, but we are not aware that it has ever been held that where an officer's term had already expired and his successor duly appointed, the latter can be prevented from performing the duties of the office and the former reinstated in the position by the legislature.

VII. We have thus far discussed the effect of the act of 1867, on the assumption that the same would have been a legal and valid enactment, in case the municipal authorities had not appointed Bradley after Steven's term had expired, and prior to the passage of the act. We will now proceed to show that the act of 1867 is in conflict with the constitution of this state.

1. Prior to the adoption of the constitution of 1846, the work of introducing the Croton water into the city had been completed; that work was completed in 1842, although a portion of the aqueduct was incomplete. The first act relating to the subject, as we have above stated, was passed in 1833, which provided for the appointment of five commissioners by the governor and senate, to be known as the water commissioners for the city of New York (*Sec.* 1). These commissioners were to make a report to the legislature as to the best plan for supplying the city of New York with pure and wholesome water, and an estimate of the expense, &c. (*Secs.* 4 *and* 5). A copy of the report was to be delivered to the common council on or before November 1, 1833, and it was to be presented to the legislature on or before the second Monday of January, 1834 (*Sec.* 5). The act was to continue in force one year (*Sec.* 6). All reasonable expenses to be incurred under the act were to be paid by the mayor, &c. (*Laws of* 1833, *pp.* 35, 36).

In 1834 another act was passed providing for the appointment, by the governor and senate, of five commissioners, &c. (*Sec.* 1).

The commissioners were to adopt such plan as, in their opinion, might be most advantageous for procuring such supply of water; and were to ascertain, as nearly as might be, what amount of money would be necessary to carry the same into effect.

They were empowered to make conditional contracts with the owners of lands required, but such contracts were subject to the ratification of the common council of the city of New York (*Sec.* 4). They were to report to the common council all their proceedings, &c. (*Sec.* 5). Report to be presented on or before January 1, 1836 (*Sec.* 6).

If the common council approved the plan of the commissioners, the question was to be submitted to the electors for their consent or refusal; and if a majority of the electors were found to be in favor of the measure, it was made lawful for the common council to instruct the commissioners to proceed in the work. The amount necessary to pay the expense was to be raised by loan by the common council, who were to issue water stock therefor to the amount of $2,500,000 (*Laws of* 1834, *p.* 451).

The work was continued under the direction of the water commissioners until it was about completed in 1842, when the legislature passed the following act:

"An act for the preservation of the Croton water-works in the city of New York (passed April 11, 1842, by a two-thirds vote).

The people of the state of New York, represented in senate and assembly, do enact as follows:

" Section 1. The mayor, aldermen and commonalty of the city of New York are hereby authorized to pass such by-laws and ordinances as to them shall seem meet for the preservation and protection of all or any of the works connected with the supplying of the city of New York with pure and wholesome water, under and by virtue of the act to provide for supplying the city of New York with pure and wholesome water, passed May 2, 1834, and the acts amending the same,

provided that such by-laws and ordinances are not inconsistent with any laws of this state, or the constitution thereof, subject at any time to be repealed or modified by the legislature ; and, also, to organize a department with full powers for the management of such works, and the distribution of the said water.

"Section 2. This act shall take effect immediately " (*Laws of* 1842, *p.* 276).

Under this act the whole control and management of the works and the distribution of the water, and the care, custody and preservation of the works was committed to the mayor, aldermen and commonalty of the city of New York.

The work having been about completed, the legislature restored to the locality for whose benefit it had been undertaken, the control of it. And accordingly, in the following September, an ordinance was passed entitled " An Ordinance to regulate the water-works of the city of New York."

AN ORDINANCE to regulate the water-works of the city of New York.

The mayor, aldermen and commonalty of the city of New York, in common council convened, do ordain as follows :

### TITLE I.

"Section 1. A department to be called the Croton aqueduct department is hereby established.

"Section 2. The Croton lake dam, aqueduct, bridges, reservoirs, distributing pipes, station-houses, offices, weirs, hydrants, pumps, fountains and stop-cocks, belonging to the corporation of the mayor, aldermen and commonalty of the city of New York, and all the land, waters and works, owned by the said corporation adjacent thereto, or connected therewith, shall be hereafter known and designated as the ' Croton aqueduct works. '

### TITLE II.

"Section 1. The water commissioners for the city of New York, by virtue of the power vested in them by the state, will

construct the aqueduct from the Croton river to the distributing reservoir, according to law.

" Section 2. All other executive duties pertaining to the Croton aqueduct works are hereby imposed upon the Croton aqueduct department, which shall consist of a board of commissioners of five citizens of the city of New York, to be appointed by the common council thereof, and hold their office during the pleasure of said common council, one of whom shall be designated as the president of said board. The president of the board shall, for the performance of his duties, be paid $2,000 per annum; and he shall also be the treasurer of said board, and give bonds in the sum of $20,000. The bond of said president shall be conditioned for the faithful performance of all duties imposed by this ordinance, and that he shall fairly and fully account to the comptroller, weekly, for all moneys received by him in the performance of his duties as president of said board, and pay the same weekly into the treasury, and in addition thereto, he shall quarterly present a statement of his receipts of money and expenditures on account of said work, to the common council of the city of New York.

" Section 3. The other commissioners shall receive no compensation, except their actual and necessary expenses incurred in visiting any portion of the works.

" Section 4. The Croton aqueduct board is hereby intrusted with the general care and supervision of the Croton aqueduct and its appurtenances, and is empowered and directed to cause the aqueduct works to be kept in complete repair, and for that purpose, to direct the employment of so many agents, workmen and other persons as they may judge necessary, to effect the said objects, at such compensation as they shall judge reasonable; but no such expenditure shall be made when the amount thereof shall exceed one hundred dollars, unless previously authorized by the joint Croton aqueduct committee.

People *ex rel.* Bradley agt. Stevens.

## TITLE IV.

" Section 1. A chief engineer, a superintendent of the aqueduct works, a water purveyor, and a register of rents, shall be appointed by the common council, to hold their respective offices during the pleasure of the said common council, unless sooner removed for cause by the Croton aqueduct board, with the concurrence of the joint aqueduct committee.

" Section 2. The chief engineer, superintendent, water purveyor, and register of rents, shall be under the immediate direction of the Croton aqueduct board, and perform such other duties, not therein provided, as may be assigned to them by the said Croton aqueduct board.

" Section 3. The chief engineer shall have, under the direction of the Croton aqueduct board, the general executive care and superintendence of the Croton aqueduct works.

## TITLE VI.

\*      \*      \*      \*      \*      \*      \*

" Section 2. The president shall cause to be kept full and accurate accounts of the lettings of the water and receive the rents for the same.  He shall keep his accounts and make returns to the comptroller of the moneys collected as hereinbefore directed.

\*      \*      \*      \*      \*      \*      \*

" Section 4. The applications for water must be in writing directed to the president of the Croton aqueduct board.  All discontinuances must also be in writing addressed to him.

\*      \*      \*      \*      \*      \*      \*

" Section 11. In case of the illness or unavoidable absence of the president his duties shall be temporarily discharged by such member of the Croton aqueduct board as shall be designated for that purpose by the joint Croton aqueduct committee " ( *Vol.* 10, *Proceedings C. C., p.* 36, *et seq.*).

The Croton aqueduct department thus established continued to exist under this ordinance until the legislation, in the year 1849, to which we shall presently refer, and was of

course in existence when the Constitution of 1846 went into operation.

2. Independently of the ordinance, however, it is quite clear, from the acts under which the water commissioners were appointed, and to which we have above referred, that the commissioners were appointed for the sole purpose of constructing the work. After it was finished they were to have no further control over it. And to place it beyond doubt that the legislature regarded the Croton water-works as properly the subject of local control, the act of 1842, above cited, was passed which conferred upon the corporation the power " to organize a department with full powers for the management of such works and the distribution of the said water."

It thus appears that the Croton aqueduct works were subject to the control of local officers, appointed by the local authorities when the present constitution went into effect, for years prior thereto, and therefore we submit that under the second section of the tenth article of the constitution it was not within the power of the legislature, after the local authorities had appointed the respondent to succeed the appellant, to provide that the appellant, whose term had expired, should still hold the office (*People* agt. *Draper*, 15 *N. Y.*, 533; *People* agt. *Devoy*, 36 *N. Y.*, 450; *People* agt. *Raymond*, 37 *N. Y.*, 428; *People* agt. *Metropolitan Police*, 19 *N. Y.*, 195, 199).

3. We may again remark here that there is no case, of which we are aware, which holds that where an officer's term has fully expired and his successor has been appointed by the proper authorities and has duly qualified, the legislature can, by statute, oust the new appointee and reinstate the old one for a new term. The case of *The People* agt. *Batchelor* (22 *N. Y.*, 128) only decides that the term of a local officer, duly appointed, may be extended beyond the time for which such appointment was made before the expiration of his term, and that such extension is not an appointment to the office.

4. In 1849 the charter of the city was amended by an act passed April second.

Section 15 provided that there should be an executive department under the denomination of the Croton aqueduct department (*Laws of* 1849, *p.* 282).

On the 11th day of April, 1849, an act was passed entitled "An act to create the Croton aqueduct department in the city of New York" (*Laws of* 1849, *chap.* 383, *p.* 537). This act was amended in particulars not bearing on this question by act of 1850 (*p.* 320), and the present organization of the department is in conformity with this act and the charter of 1857 (*Laws of* 1857, *vol.* 1, *p.* 881).

Although under the act of 1849, just referred to, the Croton aqueduct department is formally established, we contend that all the substantial powers and duties thereby conferred and imposed were granted to the corporation by the act of 1842, before cited; that the ordinance to which we have also referred, passed by legislative authority in pursuance of that statute, devolved all the substantial powers given by the act of 1842 upon local officers, and that the legislature can only transfer those powers to officers elected by the people or appointed by the authorities of the locality.

Now Mr. Stevens, when the act of 1867 was passed, was not in office either by election or appointment. He was a usurper who was preventing his legal successor from obtaining possession of the office.

An appointment of any third party to the office in question by the legislature, would have been just as legal as the retention of Stevens.

VIII. The withdrawal by the respondent of his protest and objection to the payment of salary to the appellant, did not divest the respondent of his office nor impair his title thereto.

1. Such withdrawal was neither in form nor effect a resignation of the office.

2. The only way in which Bradley could resign his office

People *ex rel.* Bradley agt. Stevens.

was by notice to the officers by whom he was appointed, to wit, the mayor and the board of aldermen.

3. The interest of Bradley in the office was not merely personal. Being the legal incumbent of the office the authorities from whom he received his title have the right to insist that he should not vacate it without notice to them and without their assent.

4. If the withdrawal of the protest could be perverted into an estoppel against claiming the salary as against the appellant, it could not preclude him, and much less preclude the people, from alleging his title to the office.

5. In no possible aspect of the case can the appellant claim title to the office on the pretense of a transfer thereof by Bradley, under the fanciful construction given by the appellant's counsel, to the mere withdrawal of a protest by an officer *de jure* against payment of salary to an officer *de facto*.

IX. The judgment below should be affirmed, with costs.

JAMES, *J.* — This is a proceeding in the nature of a *quo warranto*, to determine the title to the office of president of the Croton aqueduct board.

The facts show that April 12th, 1860, the defendant was duly appointed president of the Croton aqueduct board, for the term of five years; that on the 3d of April, 1863, an act was passed extending the terms of the officers of that board four years from the appointment of the (then) assistant commissioner, and until their successors were appointed and qualified; that one Darragh was, on said third day of April, the said assistant commissioner, and had been appointed on the 3d day of December, 1862; consequently the term of the officers of that board, holding in virtue of the act of April 3d, 1863, expired on the 3d day of December, 1866.

An act of the legislature was passed May 4th, 1866, entitled An act to enable the board of supervisors of the county of New York, to raise money by tax for the use of the corpora-

tion of the city of New York, and in relation to the expenditure thereof, which contained the following provision :

" The engineer and assistant commissioner of the Croton aqueduct department, now in office, shall continue in office for the term of three years from and after the passage of this act, and any vacancy in their number shall be filled by the members of the board remaining in office."

Before the passage of this act the power of appointing the officers of this board was in the mayor of New York, " with the advice and consent of the board of aldermen" (*See amended charter of New York, passed April 14th*, 1857). On the 7th day of December, 1866, the relator, John J. Bradley, was appointed by the mayor and aldermen of New York president of the Croton aqueduct board, in place of defendant, it being claimed that the act of May 4th, 1866, was unconstitutional and void. On the 18th day of December, 1866, said Bradley took the oath of office, and duly qualified as such president.

On the 8th day of April, 1867, an act was passed, entitled " An act in relation to the Croton aqueduct department in the city of New York," which enacted that the term of office of the persons now severally discharging the duties and exercising the powers of president-commissioner, assistant commissioner and chief-engineer-commissioner of the Croton aqueduct department, is hereby fixed for the term of five years from January 1st, 1867, and every vacancy in said office shall be filled for the residue of said term by the remaining commissioners."

At this date the defendant was discharging the duties and exercising the powers of president of said board ; and he still continues so to do. This proceeding was not commenced until the 28th day of May, 1868.

It seems to me that portions of the act of 1866, known as the tax levy of the city of New York for that year, are within section 16, article 3 of the constitution of this state, and void. Said section declares that " no private or local

bill which may be passed by the legislature shall embrace more than one subject, and that shall be embraced in the title." The act in question was a local act. It related solely to city matters; it operated only upon city officers, city funds, and city taxation; in fact, all its substantial operations were within the city limits. It is true the supply of water is brought by aqueduct from Putnam county, through Westchester county; but this is an incident to the means of supply for the use of the city, not for the use and benefit of all outside of the city, whom the board might choose to supply. Special authority to supply Sing Sing prison with water did not change the local character of the act, or increase its powers to act outside the city limits, except in the particulars specified (*People* agt. *O'Brien*, 38 *N. Y.*, 193; *The Sun Mutual Insurance Company* agt. *The Mayor of New York*, 4 *Selden*, 240).

Being a local bill the act could embrace but one subject, and that to be specified in its title. It is clear that this tax levy bill embraced more than one subject. It provided for the levying of taxes; the continuance of certain persons in office, and filling vacancies in the same. This latter subject was not embraced in the title; a person reading the title would never suspect that any other power than raising money by tax was embraced therein.

It follows from this, if there is nothing else in the case, that the defendant's term of office expired in December, 1866, and that the relator, Bradley, by virtue of his appointment, was *de jure* the president of the Croton board from the day he qualified after his appointment.

But it is claimed that this result was defeated by the act of 1867. That statute enacted that "the term of office of the persons now severally discharging the duties and exercising the powers of president, &c., is fixed for the term of five years from the 1st day of January, 1867, &c."

If this act is valid, the defendant being the person then discharging the duties of president and exercising its powers,

&c., was the person lawfully entitled to the office when this action was commenced.

There is no force in the argument that the relator was *de jure* president when said act was passed, because the act did not apply to the *de jure* president, but to the person, whoever he might be, who was then discharging the duties and exercising the powers of president, and that was the defendant. If valid, the effect of the act was a repeal of the previous statutes in respect to the appointment of president, and a legislative appointment of that officer.

This statute of 1867, it is argued, is in conflict with section 2, article 10, of the constitution, and therefore null and void. That section declares that " all city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of, &c., or appointed by such authorities thereof as the legislature shall designate for that purpose."

The Croton water-works being local, the members of its board are properly city officers, and as such are by the constitution required to be elected by the electors of the city, or appointed by such city authorities as the legislature shall direct. As the defendant does not claim title to the office through either source, he certainly cannot be permitted to retain it, as the act under which he makes claim legislates the person into office instead of providing for his election or appointment, unless the office is to be regarded as one created since the adoption of the present constitution; offices created since that time the legislature can provide for filling in any manner deemed most expedient, or may make the appointment itself (*People* agt. *Draper*, 15 *N. Y.*, 538; *People* agt. *Batchelor*, 22 *N. Y.*, 128; 32 *N. Y.*, 365, 583). It therefore becomes necessary to trace the history of the several acts in relation to these Croton works.

The act authorizing their construction was passed, and the works completed previous to the adoption of the present constitution in 1846. An act was passed in 1842, entitled " An

act for the preservation of the Croton water-works of the city of New York," which read as follows :

" Section 1. The mayor, aldermen, and commonalty of the city of New York are hereby authorized to pass such by-laws and ordinances as to them shall seem meet for the preservation and protection of all or any of the works connected with the supplying of the city of New York with pure and wholesome water, under and by virtue of the act to provide for supplying the city, &c., passed May 2d, 1834, and the acts amending the same ; provided such by-laws and ordinances are not inconsistent with any laws of this state or the constitution thereof, subject at any time to be repealed or modified by the legislature, and also to organize a department with full power for the management of such works and the distribution of the said water."

In September, 1842, under authority of this act, the mayor, &c., in common council convened, passed the following ordinances :

1st. Established a department, to be called the Croton aqueduct department, and declared that the Croton lake, dam, aqueduct &c., &c., should therefrom be known as the Croton aqueduct works.

2d. Fixed the executive duties upon the aqueduct department, which was to consist of a board of five commissioners of five citizens to be appointed by the common council, one to be designated as president, who was also the treasurer ; said board was intrusted with the care and supervision of the works.

4th. A chief engineer, superintendent of works, water purveyor, and a register of rents should be appointed by the common council, to hold their office during the pleasure of the council, &c., to be under the control of the Croton aqueduct board, &c.

6th. The president to keep account of lettings and receive rents, &c., &c.

The Croton aqueduct department continued under these

ordinances until 1849. In that year the charter of the city of New York was amended (*Laws of* 1849, *p.* 282), the fifteenth section of which act created a new executive department, called " the Croton aqueduct board," with three officers, viz., president, engineer and assistant commissioner, to form such board. Afterwards, and in the same year, another act was passed, entitled "An act to create the Croton aqueduct department in the city of New York" (*Laws of* 1849, *p.* 537).

These acts together completely remodeled the Croton aqueduct department. The office of water commissioner was abolished ; the board created in its stead was reduced to three members, and with the same and additional duties imposed upon it ; and subsequent legislation has imposed upon it further new and additional duties.

I am therefore of the opinion that the Croton aqueduct board, and the officers composing it, were in substance and effect new officers created by the acts of 1849, within the intent and meaning of the authorities above cited. Before the acts of 1849 the Croton aqueduct department was composed of five commissioners, one of whom was to be designated as president, with a chief engineer, superintendent, purveyor and register. This the said act swept away, and created an executive board, denominated " the Croton aqueduct board," to consist only of a president, engineer and assistant commissioner ; a new board with new officers to constitute it.

The creation of such offices was within the legislative power ; and being so created since the adoption of the present constitution, the legislature was not restrained in directing how they should be filled ; and might even make the appointment itself, as it assumed to do in this case.

It therefore follows that the judgment of the supreme court should be reversed.

MASON, *J.* — The claim made in this case, that the act of May 4th, 1866, transferring the power of filling vacancies in

the principal offices of the Croton aqueduct board from the mayor and aldermen of the city of New York to the members of the Croton aqueduct board itself, is invalid, as being in conflict with the second section of the tenth article of the constitution of the state, cannot be sustained.

Assuming that the president of this board is to be regarded as a municipal officer of the city, there is nothing in the act of May 4th, 1866, at all in conflict with the second section of article 10. The only restriction imposed by this second section of article 10, so far as the question arising in the present case is concerned, is, that city officers, whose election or appointment is not provided by the constitution, shall be elected by the electors of the city or some division thereof, or be appointed by such authorities thereof as the legislature shall designate for that purpose (*Art.* 10).

They are appointed by such officers or authorities of the corporation as the legislature shall prescribe, when under this act of May 4th 1866, they are appointed by the Croton aqueduct board.

The legislature have the undoubted right to say that they shall be so appointed, and all vacancies filled, either by the mayor or the board of aldermen, or any other distinct branch or authority of the city government.

We assume in this case, of course, that the relator is right in asserting that the Croton aqueduct board is an executive deparment of one branch of the city government (*Sec.* 24, *amended charter,* 1857; *Laws* 1857, *p.* 881). This, it must be conceded, is so under this amended charter of 1857.

There is another reason equally satisfactory and conclusive to my mind why this act of May fourth, transferring the power to fill vacancies from the mayor and aldermen to the Croton aqueduct board, is not objectionable, as being obnoxious to this constitutional restriction upon the exercise of the legislative power. This clause in the constitution has received judicial construction in this court. The case of the *People* agt. *Draper* (15 *New York R.,* 532), decides that this con-

People *ex rel.* Bradley agt. Stevens.

stitutional restriction relates only to such officers as existed at the time the constitution of 1846 took effect, and that the legislature is at liberty to provide for the election or appointment in any manner it may deem suitable for all officers, local or general, whose offices might be created by law after the constitution of 1846 went into effect.

This is the plain and obvious reading of the section taken as a whole, as was explicitly held by this court again in the case of the *People* agt. *Pickney and others* (32 *New York R.*, 377.)

Now the Croton aqueduct board was first created by the act of April 11, 1849 (*Laws of* 1849, *chap.* 383).

The five commissioners appointed under the act of February 26, 1833, were a mere commission to examine and report to the legislature and common council of the city as to the best plan of supplying the city with a sufficient supply of pure and wholesome water, and they were only to continue by the express terms of the act for one year.

The act of May 2, 1834, provided for the appointment by the governor, with the consent of the senate, of five water commissioners, and the whole extent of their duties were that of a mere construction commission, without any limit as to the time or term they should continue; but the fair construction to be put upon the whole legislation in regard to them is, that they were to be continued until the work of supplying the city with water was completed.

It is conceded on all hands that the work of introducing the Croton water into the city of New York was completed before the adoption of the constitution of 1846, and as early, I think, as 1842.

It is claimed, however, by the relator's counsel, that the mayor, aldermen and commonalty of the city created this Croton aqueduct board, or a Croton aqueduct department, with similar powers, under the act of April 11th, 1842, and before the constitution of 1846 went into effect (*Chap.* 225 *of the Laws of* 1842).

That act authorized the mayor, aldermen and commonalty of the city to pass such by-laws and ordinaces as to them should seem proper for the preservation and protection of all or any of the works connected with the supplying of the city of New York with pure and wholesome water, under and by virtue of the act of May 2d, 1834, and the acts amending the same; and they were authorized to organize a department with full powers for the management of such works and the distribution of the said water.

Under this act the mayor, aldermen and commonalty of the city organized a department called "the Croton aqueduct department," and provided for the appointment of a board of five commissioners, one of whom should be president; this board was to be appointed by the common council, and hold their offices during the pleasure of the said common council.

The whole control and general care and supervision of the Croton aqueduct and its appurtenances was confided to the board; the limited power of completing the aqueduct from the Croton river to the distributing reservoir was reserved to the original water commissioners.

This board was created by the corporation of the city itself, was but a mere instrumentality or agency of the municipality, and the officers thus created and appointed were not officers within this restrictive clause of the constitution.

The officers within this second section of the tenth article, they must be created directly by the constitution, or by the statute. This is expressly held in the case of the *People* agt. *Conover* (17 *N. Y. R.*, 64). I have not been able to find, nor have we been referred to any statute creating this Croton aqueduct board, until the act of April 11th, 1849, above referred to; and it follows from what has been said, that these offices were created since the constitution of 1846 went into effect, and that they do not consequently fall under this restrictive clause.

The next and most important, and certainly the most

difficult question in this case, is, whether this act of the legislature of May 4th, 1866, which transfers from the mayor and aldermen of the city of New York to the members of the Croton aqueduct board the power of filling vacancies in office in said board, is in conflict with section 16, article 3, of the constitution of the state.

The respondent claims and asserts that it is in conflict with this sixteenth section of the third article of the constitution, which provides that: " No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." This act of May 4th, 1866, is entitled " An act to enable the board of supervisors of the county of New York to raise money for the use of the corporation of the city of New York, and in relation to the expenditure thereof."

If this is to be regarded as a private or local bill it is obnoxious to both these constitutional restrictions, for it is joined with the tax levy of the city, and the subject of the bill is not expressed in the title.

I entertain no doubt that an act of the legislature to enable the board of supervisors of the county of New York to raise money by tax for the use of the corporation of the city of New York containing provisions for expenditures thereof, is a local bill within this sixteenth section of the third article of the constitution.

It was assumed in the case of *The Sun Mutual Insurance Company* agt. *The Mayor, &c., of the city New York* (4 *Seld. R.*, 240), that such a bill was local.

It is expressly declared in the opinion of judge DAVIES, in the case of the *People* agt. *Hills* (35 *N. Y. R.*, 453), that such a bill is local within the meaning of this sixteenth section of the third article of the constitution. It does not follow, however, because this bill, familiarly known as the tax levy of the city, is local, and falls within this constitutional prohibition, that this portion of the act, which transfers the appointing power to fill vacancies in the Croton board

from the mayor and aldermen to the board itself, is also invalid.

This is held in the case of *The People* agt. *McCann* (16 *N. Y. R.*, 58), where it is said that the character of an act is to be determined by its provisions and not by its title, and that general provisions are not rendered void by reason of these being contained in the same act with other provisions of merely local application, though the title of the act refers to the latter provisions only; and the case holds that no constitutional objection arose out of the consideration that the provision of the act in question was not referred to in the title of the act. The case of *Williams* agt. *The People* (24 *N. Y. R.*, 405–407), holds the same.

The question presented in the case at bar is therefore to be determined entirely independent of the tax levy; and the same as if this act was passed by itself, but without any subject whatever expressed in its title. If this is to be regarded as a local bill, it is in conflict with this sixteenth section, of the third article of the constitution, and cannot be sustained.

·This act has reference to the exercise of the power of appointment to office, and there is nothing in the power of appointment to office that is necessarily local. The first commissioners, both under the act of 1833 and 1834, were appointed by the governor, by and with the advice and consent of the senate (*Laws* 1833, *chap.* 36, *sec.* 1; *Laws* 1834, *chap.* 256, *sec.* 1). And yet the subject-matter of a bill which simply provides for the appointment of the officers of a municipal corporation is certainly local in one sense.

It is local in its application. It applies only to the municipality referred to in the act, and I think is a local bill within the intent and meaning of this sixteenth section of the third article of the constitution.

If we are right in this, it follows that the act under consideration is obnoxious to this sixteenth section of the third article in two respects, as embracing more than one subject,

People *ex rel.* Bradley agt. Stevens.

and because the subject of the enactment is not expressed in the title of the act. This must be so unless it shall be held that these commissioners are not, in the sense of the constitution, strictly officers of the corporation, or, in other words, city officers.

It becomes necessary, therefore, to inquire whether the officers composing this Croton aqueduct board are to be regarded strictly officers of the municipal corporation of the city.

This, I think, will be made quite apparent if we look at the history of the enterprise which has resulted in the constitution and organization of this board. The act of February 26, 1833, provided for the appointment of five commissioners for the city of New York, who should be citizens and inhabitants of the said city, whose duty it should be to examine and consider all matters relative to supplying the said city with a sufficient supply of pure and wholesome water for the use of its inhabitants, &c., and to report to the next legislature, and also to the common council of the city, and that all reasonable expenses incurred should be paid by the city. These commissioners were to continue but for one year.

The act of May 2, 1834, also provided for the appointment of five commissioners for the same purpose, to be known as the water commissioners of the city of New York, and they must be citizens and inhabitants of the city.

They were required to adopt a plan for supplying the city with pure and wholesome water, with estimates of the expense, &c., and report to the common council; and if the plan should be approved by the common council, then the common council were to submit the same to the electors of the city at the next annual election for charter officers, and if the electors decided in favor thereof, then the common council were authorized to instruct the said water commissioners to proceed in the work.

This was all done, and this act authorized the common council to issue stock to the amount of $2,500,000, and to

sell and dispose of the shares, and the moneys were to be applied and expended for the purpose of supplying the said city with pure and wholesome water, and the work and expenditure to be under the control of the water commissioners.

Under this act, and various subsequent acts of the legislature, authorizing the common council to raise money by the issuing of millions of stock, the Croton aqueduct was completed, and the city was supplied with water.

This whole enterprise was one on the part of and in behalf of the city, and for the benefit of the inhabitants thereof. The whole expense was borne by the city. The city having completed the work, and furnished to its inhabitants an abundant supply of pure and wholesome water, it became necessary to provide some executive department of the city government to look after and keep in repair this great work; and the legislature, by the act of April 11, 1849, created the Croton aqueduct department of the city government (*Laws* 1849, *chap.* 383), and created a board of officers, consisting of a president, &c., who should have the general superintendence and direction of all the leasings and concerns of the said department; and, by the amended charter of the city in 1857, it is provided that there shall continue to be an executive department, under the denomination of the " Croton aqueduct board," which shall have the charge of the Croton aqueduct and all its structures and property connected therewith, &c., and the underground drainage of the same, and the public sewers of said city, and permits for street vaults, and of paving and repairing streets, and digging and constructing wells, and the collection of revenues arising from the sale of Croton water, with such other powers and duties as may be prescribed by law (*Laws* 1857, *p.* 881, *sec.* 24).

The chief officers are the president, engineer and assistant commissioners; and these officers constitute the board, and shall hold their offices for five years.

The act then provided for the creation of certain bureaus

in the department, with officers to fill them ; none of which are important to consider in the case.

The whole of the structures connected with the Croton aqueduct, and the lands acquired under the acts of the legislature in the construction of this work, all belong to the city, and have been paid for by the city ; and the Croton aqueduct board, as constituted under the amended charter of 1857, are declared to be an executive department of the city government.

The officers created are paid by the city, and every official act which they perform is strictly in behalf of the city ; and I am not able to perceive why the officers of this board are not to be regarded officers of the city.

The fact that the city has erected a large reservoir in Westchester county and another in Putnam county, and have made important structures in these counties to convey the water from them to the city, and that this board of officers have the charge of all these, and have important and responsible duties to perform in these counties, and outside of the city and county of New York, cannot, it seems to me, change the character of these officers.

They are still city officers, acting for and in behalf of the corporation of the city ; they are not in any sense officers of the county of New York, Putnam, Westchester, or of any new district or civil division of the state, as were the officers appointed under the act of April 15th, 1857, creating a new metropolitan police district, which was brought under review in this court in the case of *The People* agt. *Draper* (15 *N. Y. R.*, 522).

The act in question, which transfers from the mayor and aldermen of the city to the members of the Croton board itself the power to fill vacancies in the said board, is essentially an amendment of section 19 of the amended charter of the city (*Laws* 1857, *chap.* 446, *page* 878, *sec.* 19), which provides that the heads of the departments of the city government shall be appointed by the mayor, with the advice and consent of the board of aldermen.

It was held by this court in the case of *The People* agt. *Hill* (35 *N. Y. R.*, 449), that an act to amend the charter of the city of Rochester was local; and because the act in that case did not express in the title of the bill the subject-matter of the act it was held invalid.

We also held, in the case of *The People* agt. *O'Brien* (6 *Trans. Appeals*, 9Q) that an act in relation to the term of office of the councilmen of the city was local in its character, and came within the prohibition of section 16 of the third article of the constitution (*see, also, The People* agt. *McCann*, 16 *N. Y. R.*, 60; *Williams* agt. *The People*, 24 *N. Y. R.*, 405).

That this is a local bill cannot, I think, admit of serious question. These officers are the head of one of the executive departments of the city government; the fact that they are required to perform in behalf of the city many and responsible duties in the counties of Westchester and Putnam, does not make them any the less the officers of the municipal corporation, so long as those acts are performed in behalf of the city.

It follows from what has already been said, that this provision, contained in the tax levy of 1866, transferring to the members of the Croton aqueduct board the power to fill vacancies in said board, is in conflict with section 16 of article third of the constitution, and void.

The power of appointment still remaining with the mayor and board of aldermen, the relator was properly and legally appointed, and is entitled to the office, unless he is divested of it by the act of April 8th, 1867, entitled "An act in relation to the Croton aqueduct department in the city of New York" (*Laws of* 1867, *chap.* 285).

The first section of this act provides that the term of office of the persons now severally discharging the duties and exercising the power of president-commissioner, assistant commissioner and chief-engineer-commissioner of the Croton

aqueduct department is hereby fixed for the term of five years from the 1st day of January, 1867, &c.

The appellant was, in fact, discharging the duties and exercising the powers of president at the time of the passage of said act, and was *de facto* president, and not *de jure*.

The relator had been appointed and qualified, and was *de jure* president of the said board; and it is claimed that this act of the legislature, if designed to do so, could not divest him of the office and transfer it to the defendant, whose term of office had expired.

The defendant claims to hold the office in virtue of the act of April 8, 1867, which, it is insisted, merely extended the term of the office, which this court have held in the case of *The People* agt. *Bachelor* (22 *N. Y. R.*, 128), the legislature might lawfully do.

That case would sustain the defendant's claim to this office were he holding and discharging the duties of the office *de jure;* but a different question is presented in this case, for the relator, as we have seen, was lawfully appointed, and had taken the oath of office, and duly qualified before the passage of this law extending the term of office.

This admitted the relator into office, and gave to him the lawful right to the same (*Rex* agt. *Ellis*, 9 *East R.*, 252, note; *Rex* agt. *Dublin*, 1 *Strange R.*, 538; *Rex* agt. *Bosworth, id.,* 113; *The People* agt. *Stevens*, 5 *Hill's R.*, 616, 625).

The defendant at the same time was, in fact, discharging the duties and exercising the powers of president, and refused to yield the functions of the office to the relator.

He was *de facto* president, and was discharging the duties of the office, but not rightfully as against the relator, who was entitled to the office.

This, I think, was understood by the framers of this act of April 8, 1867, as the language of the act seems studiously adopted to meet the very case.

The language is, the term of office of the persons now

severally discharging the duties and exercising the powers of president-commissioner, &c., is hereby fixed for the term of five years from the 1st day of January, 1867." The evident intention of this act was to cut off all right of the relator to this office, and continue the defendant in the office for five years longer. The act is broad enough to accomplish it, and the relator has lost his claim to the office, if it were lawful for the legislature to make such an enactment.

The question is an important one, and has not, so far as I can ascertain, been expressly decided. The sovereign law-making power resides in the legislature, with no other restrictions upon it than those imposed by the constitution of the N. G., and that of the state.

The courts of justice have a right, and are in duty bound, to bring every statute to the test of the constitution, both of the United States and of the state, as they are the supreme and paramount law to which all legislation must conform.

There is in this act the clearly expressed intention of the legislature to divest the relator of the office to which he had been legally appointed, and to continue the defendant, whose term had expired, in the office for five years longer; and the question is therefore presented whether such an act can be justified under the constitution.

It cannot be doubted that, as this office was created by statute, the legislature could abolish the office at any time, and deprive the incumbent of all right to the office, without regard to the term of office or the future salary of the incumbent (*Connor* agt. *The Mayor, Aldermen and Commonalty of the City of New York*, 3 *Sand. S. C. R.*, 355, *and cases there cited*). Chief-justice MARSHALL, said, in the *Dartmouth College Case* (4 *Wheat. R.*, 627), that public officers are not within the inhibition of the constitution of the United States against laws impairing the obligations of contracts; that the inhibition does not extend to officers within a state, for state purposes; that the legislature must necessarily control such offices, and may change and modify the laws concerning them

as circumstances may require ; that grants of political power to be employed in the administration of the government, are to be regulated by the legislature of each state, according to its own judgment, unrestrained by any limitation of its power imposed by the constitution, or the constitution of the United States.

In the same case judge STORY said, the state legislature have power to enlarge, repeal, or limit the authority of public officers, in their official capacity, in all cases when the constitution of the state does not prohibit it ; and this, among others, for the very good reason that there is no express or implied contract that they shall always during their continuance in office exercise such authority.

They are to exercise them only during the good pleasure of the legislature ; and he compared the duty of public offices, created by statute, to a naked power, which is revokable at pleasure.

It is held in the case of *Connor* agt. *The Mayor, &c., of the City of New York* (2 *Sandford S. C. R.*, 355) that an office created by law may be repealed by law, without regard to the term or future salary of the incumbent.

That there is no contract, express or implied, between a public officer and the government whose agent he is.

Nor have public officers any proprietary interest in their offices, or any property in the prospective compensation attached thereto, whether it be in the shape of salary or fees.

The case was affirmed on appeal in this court, and the headnote of the case states very accurately what is decided in the case, to wit, that public offices in this state are not incorporeal hereditaments, nor have they the character or qualities of grants.

That the prospective salary or other emoluments of a public office are not property in any sense, &c. The act in question, then, which takes away from the relator this office, is not obnoxious to section 6 of article 2 of the constitution of

the state, which provides that "no person shall be deprived of property without due process of law."

Nor is it in conflict with section 10 of article 2 of the constitution of the United States, which provides that "no state shall pass any law impairing the obligation of contracts."

See, also, the case of *The People* agt. *Devlin* (33 *N. Y. R.*, 273), where it is held that there is no contract, express or implied, between the officer and state, that he shall continue to receive the emoluments of the office as they existed at the time he took the office.

A law creating an office may be repealed before the term of office has expired under the provisions of the law, and the repeal determines the office and the compensation (*The People* agt. *The Auditor*, 1 *J. Com. R.*, 537).

It is said in the prevailing opinion of the court in the case of *The People* agt. *Batchelor* (22 *N. Y. R.*, 137), that what the legislature may do, it may undo, unless prohibited by some provision of the constitution.

That there is nothing in the constitution which, either expressly or by implication, restrains the legislature from altering or changing the term of any office which it has once fixed.

I shall assume the law to be settled by the decision of our own courts in this state, that is, to all public offices created by statute, the incumbent of the office has no proprietary interest in the office, property, no claim to prospective fees or salary, which he can assert as against the power and authority of the legislature, which asserts the right to deprive him of them. That such officer has no vested rights which he can assert as against the legislative authority which seeks to deprive him of them. These offices having been created since the constitution of 1846 went into effect, the legislature is entirely untrammeled as to the means it shall employ both in regard to appointments to office in this board, and as to removals and the filling of vacancies. It can make and

People *ex rel.* Bradley agt. Stevens.

unmake the law as it pleases. The power of the legislature in this respect is absolute and uncontrolable as any law flowing from a sovereign power can be. The legislature can provide by law for conferring the absolute power of removal upon any particular agency it may see fit, or it may exercise the power itself. It can confer the appointing power upon any such agency, or it may exercise it itself.

The argument of respondent's counsel upon this branch of the case is put to the court with evident hesitancy and doubt, and well it might be, as it is opposed to a very familiar principle of elementary law, to wit, that the legislature can confer the power upon another to do what it cannot do itself. We can only test the validity of this act by the limits imposed upon the legislative power; we are not permitted to decide between the moral fitness of the legislative act and the political or legislative authority.

We cannot declare an act of the legislature void because it conflicts with our opinion of policy, expediency or justice. The remedy for unwise or oppressive legislation, within constitutional bounds, must be by appeal to the justice and patriotism of the representatives of the people.

The courts can afford no relief in such cases. No right exists in the courts to interfere in such cases where the legislature have deliberately passed an act, and clothed it with all the solemnities and authority of a law; no court has a right to pronounce against its validity unless it can clearly say that the legislature has transcended its constitutional limits in the enactment of the law. We cannot say this in regard to this act of April 8, 1867, which continues the defendant in office, and depriving the relator of the same. This leads to the reversal of the judgment of the supreme court, and the granting of a new trial.

Grover, J. — In *The People* agt. *O'Brien* (38 *N. Y.*, 193), it was held by this court that the act authorizing the levy and collection of taxes within the city of New York

was a local act within the meaning of section 16, article 3 of the constitution, and therefore could only embrace one subject, and that must be expressed in the title. It was accordingly held that a section inserted in such act extending the time of office of councilmen of the city was repugnant to that section of the constitution, and void. Applying the principle thus settled by this court to the present case, it necessarily follows that the provision inserted in the tax levy act of 1866, extending the term of office of the engineer and assistant commissioner of the Croton aqueduct board for three years, and empowering the remaining members of the board to fill any vacancies therein, is also repugnant to the constitution, and therefore void, unless it shall be held that the officers of the board are not city officers. The latter will scarcely be claimed. It is true that they have some duties to perform outside of the city limits in respect to the property of the city thus situated, but all such duties relate to the property of the city and its rights and interest in respect to the supplying of water to the city.

All the money expended by them, their compensation, and that of officers appointed by them, and persons employed by them, is paid by the city. This provision being void, the power of appointment vested in the mayor and aldermen of the city by the existing law was not thereby repealed. The relator's appointment to the office of president of the Croton aqueduct board on the 17th of December, 1866, by the mayor and aldermen, was therefore legal, and conferred upon him a perfect right to the office with its emoluments.

The term of the appellant had expired at this time, and he was only authorized to act until his successor was appointed and qualified. The relator qualified upon the eighteenth of December, and endeavored to enter upon the discharge of the duties of his office, but was excluded therefrom by the appellant, who from thence continued to exercise the functions of the office, in violation of law, until the eighth of the succeeding April, at which time the legislature passed the act

entitled An act in relation to the Croton aqueduct department of the city of New York, the first section of which is as follows : The terms of office of the persons now severally discharging the duties and exercising the powers of president-commissioner, assistant commissioner, chief engineer of the Croton aqueduct department, is hereby fixed for the term of five years from the 1st January, 1867, and every vacancy in said offices shall be filled for the residue of said term by the remaining commissioners.

All appointments after the expiration of said term shall be filled for the full period of five years. It is claimed by the counsel for the appellant that the effect of this act was to remove the relator from the office and appoint the appellant thereto for the unexpired term of five years.

This effect must be given to the act or the appellant can derive no benefit therefrom. This presents two questions : First, whether this is the true construction of the act ; and, if so, secondly, whether the office in question is one to which an appointment and removal therefrom can constitutionally be made by legislative enactment.

It must be borne in mind that the appellant had at the time of the passage of the act no term whatever unexpired in the office, or any title or right thereto whatever, but was a mere usurper therein.

It must be assumed that the legislature were aware of this fact, to give any color of probability to the construction contended for. It must also be borne in mind that the construction contended for would give just as perfect a title to the office to one who one week previous to the passage of the act had seized it by violence and thus retained it to the time of its passage as to the appellant, the latter in a legal sense being just as much a usurper as the former.

The inquiry naturally arises, if the legislature designed by the act in question to remove from office the lawful incumbent and appoint the usurper thereto, why they did not use apt and proper words to express such intent. A perusal of

other acts passed at the same session will show that such omission was not from want of capacity.

The only answer that can be given is, that such an act would be so improper that its purpose and intent must be concealed from view, and hence language was used conveying only the idea that the terms of those rightly in office was extended by the act merely. This is the only possible idea that would enter the mind of any one not knowing that a usurper, without any color of right, was in the actual discharge of the duties of any one of the offices referred to. There is nothing contained in the act calculated to excite any suspicion that such was the fact.

There can be no assumption that the legislature was at all aware of any such fact, for if they were all can see that removing the rightful incumbent, who could not, in any respect have failed in the discharge of any duty, because he had down to that time been wholly excluded from the office by a usurper, and reward such usurper by appointing him to the office, would be an act unprecedented in legislation.

The language shows plainly that the legislature had no such design. The language is, that the term of office, &c., is hereby fixed for the term of five years. The appellant had no term of office, and consequently is not within the act. To argue that he comes within it because, by his own wrongful act, he was discharging its duties at the time, is manifestly against the sense of the act when read and considered as a whole.

The use now sought to be made of the act shows that a base fraud was designed by those asking for its passage, but the necessity of concealing the design from the legislature compelled the use of language that failed to accomplish their object. Upon this ground the judgment should be affirmed.

But the second question involved is equally fatal to the claim of the appellant. The various statutes passed in relation to supplying the city of New York with Croton water before the adoption of the constitution, show that it was so

supplied prior to that time; that at that time the whole sub-
ject was just as much under the control of city officers as it
is at the present time under those denominated the Croton
aqueduct board. We have already seen that the latter are
city officers. That the situation of a part of the property
of the city, subject to their control, outside of its limits
makes no difference in the character of their offices.

Nor can the fact that they have been authorized by the
legislature to contract on behalf of the city for supplying
the state prison at Sing Sing with Croton water effect any
change in the character of the offices. It follows that the
duties of the board having been performed by city officers
at the time of the adoption of the constitution, these officers
charged with their performance must, under section 2,
article 10 of the constitution, be elected by the electors of
the city, or appointed by some city authority (*People* agt.
*Draper*, 15 *N. Y.*, 533; *People* agt. *Raymond*, 37 *N. Y.*,
428).

Devolving upon the board other duties previously per-
formed by other city officers, such as the case of the drainage
of the city and its sewers, makes no difference in this
respect (*See cases supra*).

It follows that the legislature had no power to make an
appointment to the office in question. That if the con-
struction of the act contended for is the true one, the act,
so far as it appoints the appellant to the office, is in con-
flict with section 2, article 10 of the constitution, and
therefore void; extending the term of an officer by act of
the legislature is a different matter, not involved in this case.

There is nothing in the point that the relator withdrew
his protest against the payment of the salary to the appellant.
This was no resignation of the office by the relator, and it
is not argued by the appellant that the relator had any power
to appoint him to the office, or that he made any such appoint-
ment, or attempted any. The judgment appealed from
should be affirmed.

*Motion for a new trial.*

At the September term, 1869, a decision of this court was made in this *quo warranto*, reversing the judgment in the court below, and ordering a judgment for the defendant (appellant).

The plaintiffs move to have the decision and judgment of this court modified, by the ordering of a new trial, or for a rehearing.

To enable this application to be made, an order was granted by a judge of this court, on the day the decision was announced, which required the clerk to retain the remittitur, and stayed all proceedings, &c.

The action was instituted by the people and the relator to try the title to the office of president of the Croton aqueduct board.

The appellant's (defendant's) term having expired, the relator, John J. Bradley, was nominated to the office by the mayor, and confirmed by the board of aldermen in December, 1866, and he thereupon duly qualified.

Judge MASON says: " The power of appointment still remaining with the mayor and board of aldermen, the relator was properly and legally appointed, and is entitled to the office, unless he is divested of it by the act of April 8, 1867, entitled 'An act in relation to the Croton aqueduct department in the city of New York ' " (*Laws*, 1867 *ch.* 285).

Judge JAMES expresses the same view. He says: " The relator, Bradley, by virtue of his appointment, was *de jure* the president of the Croton aqueduct board from the day he qualified after his appointment."

Judge GROVER delivered an opinion in favor of affirming the judgment of the supreme court.

The question as to whether the relator was divested of his office by the act of April, 1867, is thus stated by judge MASON : " The Croton water-works being local, the members of its board are properly city officers, and, as such, are, by the constitution, required to be elected by the electors of the city, or appointed by such city authorities as

People *ex rel.* Bradley agt. Stevens.

the legislature shall direct. As the defendant does not claim title to the office through either source, he certainly cannot be permitted to retain it, unless the act under which he makes claim legislates the person into office instead of providing for his election or appointment; unless the office is to be regarded as one created since the adoption of the present constitution. Offices created since that time the legislature can provide for filling in any manner deemed most expedient, or may make the appointment itself. * * * It therefore becomes necessary to trace the history of the several acts in relation to these Croton works."

The judge at circuit did not find the fact whether this office did or did not exist prior to the constitution of 1846.

The opinions delivered by members of this court who advised a reversal of the judgment conclude that the office did not exist prior to 1846, and proceed upon that theory.

The relator claims that the office was duly created and then in existence in substance and effect, and that it can be established as an independent fact that the office was then in existence.

Judge MASON concludes his opinion as follows: "This leads to a reversal of the judgment of the supreme court, and the granting of a new trial."

Judge JAMES says: "It therefore follows that the judgment of the supreme court should be reversed."

Judge GROVER says: "The judgment appealed from should be affirmed."

I. If the people can establish as a fact that under laws in existence prior to the adoption of the constitution of 1846, the office in question had been created and established, it will necessarily follow that the judgment should be in favor of the plaintiffs.

1. The general rule is, that "where a judgment is reversed a new trial should be awarded; and in most cases it is imperatively necessary for the attainment of justice" (*Halsey* agt. *Flint*, 15 *Abb.*, 367, 372).

2. The complaint in this action sufficiently sets forth a title to the office, and the court, at *nisi prius*, rendered judgment in these plaintiffs' favor on the proofs adduced. "It is impossible for the appellate court to know that though it might deem the proof which had been given insufficient to sustain the judgment, the defect might not be supplied upon another trial" (HARRIS, *J.*, *Edmonston* agt. *McLoud*, 16 *N. Y.*, 543, 545).

Judge HARRIS continues: "But where the appellate court can see no possible state of proof applicable to the issues in the case, which will entitle the party to a recovery, it is not necessary or even proper that a new trial should be awarded. In my judgment this is such a case. The plaintiff cannot, by any proof adapted to his own allegations, entitle himself to a judgment in his favor" (*See Astor* agt. *L'Amereux*, 4 *Seld.*, 107; *Marquat* agt. *Marquat*, 12 *N. Y.*, 336).

3. If any doubt exists as to whether the fact sought to be established would affect or influence the judgment to be rendered, the new trial should be ordered.

II. The counsel for the people and relator believe that it can be established as matter of fact that the office in question was created in the year 1842.

1. On the 11th of April, 1842, the legislature passed an act entitled "An act for the preservation of Croton waterworks in the city of New York," of which the following is a copy:

"The people of the state of New York, represented in senate and assembly, do enact as follows:

"Section 1. The mayor, aldermen, and commonalty of the city of New York, are hereby authorized to pass such by-laws and ordinances as to them shall seem meet for the preservation and protection of all or any of the works connected with the supplying of the city of New York with pure and wholesome water, under and by virtue of the act to provide for supplying the city of New York with pure and wholesome water, passed May 2d, 1834, and the acts amending the

same, provided that such by-laws and ordinances are not inconsistent with any laws of this state or with the constitution thereof, subject at any time to be repealed or modified by the legislature, and also to organize a department with full powers for the management of such works and the distribution of the said water.

Section 2. This act shall take effect immediately (*Laws of* 1842, *p.* 276).

2. It was not found as a fact that any action had ever been taken to organize a department under this act, *non constat*, so far as the case presented in the supreme court, but that the portion of the act relative to organizing a department had remained a dead letter on the statute book, or if action had been taken under it that it had not been repealed.

It was *arguendo* called to the attention of the court that at some period prior to 1849 an ordinance had been passed creating the " Croton aqueduct department," which designated the offices of president, chief engineer, superintendent, water purveyor, register of rents, &c., and defined their respective powers and duties.

Judge MASON, in his opinion, refers to this ordinance in general terms. Of course the fact of the existence of the ordinance not having been proven at *nisi prius*, it, although referred to in the opinions, could not enter into the judgment of the court. The remarks or comments upon it on the part of the court (which, however, were invited by counsel) were *obiter*.

3. But it is submitted that judge MASON, in considering the effect of it, entirely misapprehended certain decisions of this court. He says: " This board was created by the corporation of the city itself, was but a mere instrumentality or agency of the municipality, and the officers thus created and appointed were not officers within this restrictive clause of the constitution."

4. In 1858 this court determined that a mere agency of a municipal corporation is not an office of the state. To be

such the office must be created directly by the constitution or by statute (*People ex rel. Devlin* agt. *Conover*, 17 *N. Y.*, 64).

This case was cited by judge MASON and misled him. It only decided that an officer created under the ordinance organizing the street department was not a state officer so as to give the power of filling a vacancy therein to the governor.

5. We are not aware that it has ever been denied that the street commissioner of the city of New York, as organized under the act of 1849, was not a " city officer," and as such must be elected or appointed by the electors or local authorities. Judge STRONG says : " The office of street commissioner under the new act is substantially a reorganization of that office under the former law. The officer under that name continued in office and held the office as reorganized.

The opinions of judges MASON and JAMES recognize the members of the Croton aqueduct board, as organized under the city charter of 1849, as properly city officers.

6. It is submitted that the officer, under the act of 1842 establishing a department, and the ordinance thereunder, is created a city officer quite as effectually as the officers are created under the act and ordinance of 1849. This section was in harmony with the twenty-first section of the charter of 1830, which provided that the executive business of the corporation of the city of New York should thereafter be performed by distinct departments, which it should be the duty of the common council to organize and appoint for that purpose (*Laws* 1830, *ch.* 122).

7. The duties imposed on the members of the board by the act of April 11, 1849, were, in substance and effect, the same as those conferred upon it by the act and ordinance of 1842. The department was reaffirmed by the charter of April 2, 1849, nine days before the passage of the act of April 11, 1849. " It is not enough to take the case out of the provisions of the second section of the tenth article, that the names of officers existing when the constitution was adopted

are afterwards changed by an act of the legislature, or that their functions are colorably modified, The constitution regards substance, and not mere form (DENIO, *J.*, *People* agt. *Draper*, 15 *N. Y.*, 532, 539; *Devoy* agt. *The Mayor*, 36 *N. Y.*, 449, 450; *People* agt. *Pinckney*, 32 *N. Y.*, 377, 382).

8. Where express authority is conferred upon a municipal corporation to create and appoint executive departments, the officers of such departments are necessarily city officers. No case has arisen until the present in which the courts have been called upon to determine otherwise. When a power to legislate upon matters of public concern is delegated to municipal corporations, their acts, within their proper limits, have the same force and effect as if such acts had emanated from the state legislature in the first instance (*Clarke* agt. *City of Rochester*, 20 *N. Y.*, 605).

9. This rule applies as well to the creation of officers as to the discharge of any other political function. When the political duty is conferred it involves the creation of the necessary officers. The officers thus appointed are city officers. "An office is a public charge or employment, and the term seems to comprehend every charge or employment in which the public are interested" (*Chan.* SANFORD, *Wood's Case*, 2 *Cow.*, *n*). Every office is considered public the duties of which concern the public (5 *Bac. Abr.*, 180; 2 *Tom. Dic.*, "*Office;*" *People* agt. *Bedell*, 2 *Hill*, 199). BEST, Ch. J., in *Henley* agt. *The Mayor of Lyme* (5 *Bing.*, 91), said: "In my opinion, every one who is appointed to discharge a public duty, and receives compensation, in whatever shape, whether from the crown or otherwise, is a public officer" (*See judge* HAND's *opinion*, *People* agt. *Hayes*, 7 *How., Pr.*, 248, 250).

*People* agt. *Bedell* (2 *Hill*, 196, 199), was an indictment for not paying over moneys received by him for village taxes. The defendant had been appointed by the trustees of the village, and it was objected by him that the village charter did not authorize the appointment, and that if it did, he was not

a public officer or person within the meaning of 2 Revised Statutes, 696, section 38. He was committed. The court, in substance, said, a collector is not mentioned in the section defining the officers of the corporation, and none of the subsequent sections provide in terms for the election or appointment of such an officer. Other sections mentioned a collector, referring to his duties, and the court decided that there might be such an office in the village; that "the village of Geneva is a public corporation exercising certain powers of government within a limited district. The officers of the corporation are charged with the performance of public duties, and they are none the less public officers because their powers are confined within narrow territorial limits. * * * There can be no doubt that he is a public officer within the meaning of the statute under which he has been indicted. We are referred to 1 Revised Statutes, 195, title 1, which contains an enumeration and classification of public officers, but the defendant is none the less a public officer because the office of collector of the village of Geneva is not mentioned in that catalogue.

10. In *People* agt. *Pinckney* (32 *N. Y.*, 389) judge Davis held that the members of the fire department were not public officers; that the department was a representative of a public charity, which was the chief object of its creation; that it was not a municipal or political body, and that neither it nor its officers occupied any greater official relation to the public than those of the numerous religious and charitable corporations of the state.

The case and point determined, therefore, can have no relation upon the present one.

III. An order should be granted so amending the decision as *to direct a new trial,* &c., as asked for by the order to show cause.

The court of appeals having reversed the judgment below, and having ordered judgment for the appellant, the relator

obtained an order to show cause, from a judge of that court, on the day the decision was announced, requiring the clerk to return the remittitur with a stay of proceedings, and moved the court to have the decision and judgment modified, by the ordering of a new trial, or for a rehearing.

The opinion delivered by the judges of the court who advised a reversal of the judgment, concludes that the office of appellant did not exist prior to the constitution of 1846 ; and as the judge at circuit did not pass upon the fact whether it did or did not exist prior to that date, the relator claimed that the office was duly created, and then in existence in substance and effect, and that it could be established as an independent fact that the office was then in existence.

After argument, the court of appeals modified its judgment and ordered a new trial.

A new trial was had before BRADY, J., who delivered an opinion in favor of relator, from which no appeal was taken.